2024 IL App (4th) 220798

NO. 4-22-0798

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 12, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| JORDYN HARRIS THORNTON, | ) | No. 19CF600 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court, with opinion.
Justice Doherty concurred in the judgment and opinion.
Justice Steigmann specially concurred, with opinion.

**OPINION**

¶ 1     Defendant, Jordyn Harris Thornton, appeals from his conviction for first degree murder (720 ILCS 5/9-1(a)(1) (West 2022)). On appeal, defendant argues the trial court erred when it (1) admitted social media messages that were more prejudicial than probative, (2) admitted two witnesses' prior inconsistent statements, (3) failed to conduct a proper inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), and (4) committed manifest error when it concluded defendant's claims of ineffective assistance of counsel did not warrant the appointment of new counsel. The State responds the court did not abuse its discretion when it admitted both the social media messages and prior inconsistent statements. The State further asserts the court adequately

conducted the *Krankel* inquiry and properly determined the appointment of new counsel was not necessary. We affirm.

¶ 2                                I. BACKGROUND

¶ 3            In June 2019, the State charged defendant by information with three counts of first degree murder for his alleged involvement in the October 2018 shooting death of Trevonte Kirkwood (*id.* § 9-1(a)(1), (a)(2)). The charges alleged defendant personally discharged the firearm involved in the shooting. The charges were later superseded by bills of indictment.

¶ 4                                A. Jury Trial

¶ 5            In February 2022, the trial court conducted defendant's jury trial over three days. The State's evidence showed the following.

¶ 6                           1. *Kirkwood's Death*

¶ 7            On the evening of October 30, 2018, Kirkwood drove with his girlfriend, Amari Anderson, and his brother, Anthony Hoye, to visit his cousin Tay's home on North Oak Street in Bloomington, Illinois. The car battery died, and Kirkwood walked away while the others waited for assistance from Hoye's friend, Jonathan Wimp, to help jump-start the car. While the group, minus Kirkwood, waited to ensure that the car would continue running after the jump start, Anderson, Hoye, and Wimp heard three gunshots from the direction Kirkwood had walked. The group found Kirkwood yelling, calling for Hoye, and stumbling. Kirkwood fell near a sidewalk and was bleeding from his chest. Kirkwood died soon afterwards from bullet wounds to his heart, buttocks, and leg.

¶ 8            Scott Denton, a forensic pathologist for the McLean County Coroner's Office, testified Kirkwood bled to death internally from wounds in his heart and aorta. Denton recovered

three medium-caliber bullets, the appearance of which led him to believe they were fired from a revolver or rifle.

¶ 9 Several residents around North Oak Street were at home when they heard gunshots. Phillip Smith testified the gunshots sounded like they came from a 9-millimeter or .38-caliber handgun. Nicholas Ballard testified he heard the shots and saw a man fall down while coming out of an alleyway. The man said he had been shot and fell near Ballard's driveway. Additionally, Adam Steinhoff was standing outside of his house when he observed a Chevy HHR speeding away from the direction of the gunshots. Video from the scene of the shooting showed a Chevy HHR leaving the area. Officers eventually traced the vehicle to a woman named Unique Clark, who informed officers she was friends with defendant and had allowed him to borrow her vehicle on October 30, 2018, while she was at work.

¶ 10 During their investigation, Bloomington police reviewed video from community and business surveillance cameras and received anonymous tips. The investigation led officers to interview Keyshaun White, Koebe Harris, Quentin Jackson, Kajuan Hopson, Kent Woods, Darien Davis, and defendant. Officers also monitored the individuals' social media accounts.

¶ 11 2. *Keyshaun White*

¶ 12 White (also known as "Keese") testified he knew defendant, who sometimes went by the nickname "Thunder." On October 30, 2018, White and a friend went to a house on Front Street to buy marijuana. Davis, Hopson, and Jackson were also there. White left for his sister's house in Bloomington after about 10 minutes and spent the rest of the night there with Woods and Harris. They were still there when they heard someone had died. According to White, he and defendant hung out after October 30 but defendant had not said anything that made him think defendant shot Kirkwood. However, when pressed about his previous statements to police, White

acknowledged he previously told detectives defendant had used certain phrases, but they were things "everyone" used. Specifically, the following colloquy ensued:

"Q. Did the defendant make statements calling himself a killer?

A. Yes, but I also did the same thing. Quentin did it, everybody did it even before anybody—you know, anything happened like that. Everybody did it. It's just, like, you know, if you pay attention to the urban community, everybody do that. Everybody doing that. Everybody doing it.

* * *

Q. Directing—going back to that April 26th of 2019 interview that was audio and video recorded, isn't it true that you told the detectives quote, 'Like, Jordyn, he give me hints that it was him'?

A. Yes. I did say that. But I said that because there was a story circulating—I'm pretty sure you might get to this question. But there was a story circulating around, and I think that story was just put out there to try to throw the police off from what actually happened. So anybody who was saying that at the time, you know, anybody who was saying anything like that, it was a couple people in my—that, you know—I never knew for sure who—I don't know. I don't know for sure who did it. I wasn't there.

* * *

Q. When the defendant would say real killer, what did that mean?

A. A real killer. I mean, them—them words self-explanatory. But that doesn't mean that he committed a murder.

Q. Well, on April 26th of 2019 did you tell Detective Jones what real killer actually means?

A. I told him what I thought it meant. But everybody have their own definitions for certain stuff.

Q. What did you tell him that you thought it meant?

A. I thought it meant you did kill somebody. I mean, but that doesn't mean that you actually killed somebody. Everybody do that.

Q. In that interview on April 26th of 2019 didn't you tell Detective Jones that you would say real killer like you know he was a real killer, like he really killed him?

A. No.

Q. No, you didn't say that?

A. I don't know—I don't know if he took what I was saying wrong, but that ain't what I—that ain't what I meant."

White maintained he did not know who shot Kirkwood. Prior to White's testimony, during the testimony of Bloomington Police Officer Paul Jones, the State played a video of White's April 26, 2019, interview for the jury.

¶ 13    On cross-examination, White testified he used to be a member of the Black Boys Entertainment (BBE) street gang. Defense counsel admitted White was arrested for aggravated battery and mob action on April 25, 2019, the day before he spoke with the police about this case. White had a previous conviction for possession of a firearm without a firearm owner's identification (FOID) card and was on parole for possession of a firearm by a gang member.

¶ 14                          3. *Darien Davis*

¶ 15        Davis, also known as "DayDay," asserted his fifth amendment right against self-incrimination regarding his involvement in the shooting of Kirkwood. The State provided him with use immunity for his testimony at trial. Davis appeared in the custody of the Illinois Department of Corrections and had a number of felony convictions. He was not made any promises for his testimony at trial.

¶ 16        Davis testified in 2018, he socialized with Hopson, Jackson, Harris, and White. Davis met defendant around October 2018 and occasionally spent time with him but did not know him well. Davis spent the afternoon of October 30, 2018, getting high on ecstasy, Xanax, alcohol, and marijuana. Because he was intoxicated, he did not remember most of that evening. Davis recalled going to a house or an apartment on Front Street but could not recall who was there. However, in his May 1, 2019, interview with police, Davis informed detectives Hopson, Harris, and a person named "Cuz" were there.

¶ 17        That evening, the group took two separate trips to the Red & Blue convenience store. On the first trip, they took Woods's car. Davis testified he did not know who he was with or what vehicle they drove on the second trip to the Red & Blue. However, in his November 9, 2018, interview with police, Davis told detectives they went with a person they called "Cuz," in his light blue or gray car. Davis testified he did not know who Cuz was. However, Davis previously told police defendant, or "Thunder," was the person they had been calling "Cuz." Although Davis testified he did not remember a "commotion" occurring during the group's second trip to the Red & Blue, he previously told detectives there was an incident involving a rival group of people who did not like them. Someone in the rival group said "f*** C.J.," which Davis explained was upsetting because C.J. was a friend of theirs who had died. After leaving the Red & Blue, they returned to Front Street.

¶ 18        Davis testified he did not remember if they left the apartment on Front Street again that night, but he had previously told detectives they went to Smoke and Pop on Main Street to buy cigarettes. He testified he did not remember who went along with him or what vehicle he was riding in because he was in and out of consciousness. They decided to go back to the apartment on Front Street, and Davis testified he did not remember the route they took. Davis testified he did not remember what happened on Lee Street, but when asked if he heard gunshots, Davis testified, "I heard loud—like I said, I heard a lot [*sic*] popping, a loud banging sound and that's when I woke up. But when I woke up that's when everybody was still in the car." Davis could not recall if Jackson, Hopson, or defendant shot Kirkwood.

¶ 19        The State played video of Davis's police interviews for the jury. In the video of the interview conducted May 1, 2019, Davis indicated that on the night Kirkwood was killed, he was in Clark's car that "Thunder" had borrowed. Davis stated, "I remember us pulling up. I guess they seen somebody. I was over there. They was looking out the window. Spin the block, spin the block. And that's when—that's when Thunder got out and shot him." Later in that interview, the police asked Davis whether Jackson or Hopson shot Kirkwood. Davis responded, "No." They then asked Davis if defendant did the shooting, and Davis answered, "Yes."

¶ 20                            4. *Kajuan Hopson*

¶ 21        Kajuan Hopson ("TK") asserted his fifth amendment right against self-incrimination as to his involvement in this case. The State provided him with use immunity for his testimony at trial.

¶ 22        On October 30, 2018, Hopson was socializing with Jackson, Davis, and Harris at the Front Street apartment, where he saw defendant, who people had been calling "Thunder" and "Cuz." Hopson went to the Red & Blue convenience store twice that evening. On the first trip,

Woods drove Hopson, Davis, and Harris there, where they saw Shawndell Wright and another person. Hopson explained that Wright did not like Hopson or his friends. Although "nothing happen[ed]" during the first trip, the group "exchanged words" with Wright, which Hopson explained was an invitation to fight. On the second trip to the Red & Blue, Wright and some others walked across the street toward Hopson's group. According to Hopson, his group left because it looked like some of Wright's group were carrying guns. Hopson testified that they eventually went to look for White, but not because White knew where to find Wright. However, in an April 30, 2019, statement to police, Hopson claimed they went to find White because he knew where Wright lived. Hopson initially testified his group was merely looking to "talk" to Wright, but he eventually admitted they intended to fight him.

¶ 23        The group left the Front Street apartment to find White in a "little," "dark-colored car." Jackson drove, Davis sat up front, Hopson sat on the rear driver's side, and defendant sat on the rear passenger's side. When they could not find White, they decided to return to the Front Street apartment. On their way back to Front Street, Jackson stopped the car, and defendant exited. Hopson did not see what defendant did when he got out of the car, only that he walked off. Hopson did not know if defendant was following anyone, but a person was walking in the area. In his April 2019 interview, Hopson said defendant got out of the car and followed the person he observed walking. When defendant walked back to the car, he was breathing heavily, had his hands in his pockets, and did not say anything. Afterwards, when they returned to the apartment on Front Street, defendant took a shower.

¶ 24                        5. *Quentin Jackson*

¶ 25        Jackson appeared in custody in connection with the shooting in this case. After the State charged him with first degree murder, Jackson pleaded guilty to aggravated discharge of a

firearm after providing a statement to the police. Jackson testified he had never met defendant and did not recall who was at the apartment on Front Street when he arrived. However, in an October 23, 2019, statement to police, Jackson told detectives that on October 30, 2018, he went to the Front Street apartment where defendant, Hopson, Davis, and Harris were socializing. Jackson did not recall making multiple trips to the Red & Blue store or if defendant was present during either trip. Jackson testified he did not see anyone at the Red & Blue that caused them to leave and did not know Shawndell Wright. Although he testified he did not see Wright at the Red & Blue, in his October 2019 statement to police, Jackson said he saw Wright and six other people coming across the street. Jackson told everyone to get back in the car, and they left because he did not want to have an argument with Wright and his group. He testified there were no previous issues between Jackson's group and Wright's group and he did not hear Wright or anyone else disrespect his brother, C.J.

¶ 26         Jackson did not recall if he left the apartment on Front Street again, but on October 23, he told police they sat at the apartment for about 30 minutes before realizing they had forgotten to buy cigarettes. The group traveled to the Smoke and Pop store to buy cigarettes, but Jackson did not recall what car they took or who was present. On October 23, Jackson told police he drove Clark's car, and he described the position of the passengers consistent with Hopson's description. He testified he did not recall the route he took back to Front Street, if defendant told him to stop the car, or if he stopped the car at some point. In his October 23 statement to police, Jackson claimed they drove down Lee Street. He also told police Davis said, " 'There he go,' " after which defendant asked him to stop the car. Jackson stopped the car and defendant got out and walked off. Jackson testified he did not recall if he moved the vehicle. On October 23, Jackson told police he

pulled into a driveway, reversed the car, and proceeded down a side street. He eventually saw defendant, who reentered the car, and the group returned to Front Street.

¶ 27                                             6. *Kent Woods*

¶ 28        Woods was in the custody of the Illinois Department of Corrections after pleading guilty to an unlawful use of a weapon charge in 2021. Woods first recalled meeting defendant around 2018, when he socialized with Harris. On October 30, 2018, Woods went to the apartment on Front Street, where he saw Hopson, Davis, Harris, Jackson, and defendant.

¶ 29        At some point, Woods left with a group to go to the Red & Blue, taking his Lincoln SUV and Clark's silver car. The group drove around for a while and then went back to the apartment on Front Street. When Woods and Harris went into the apartment, Woods saw Clark's car leave again. He did not know where they were going. A few minutes later, Woods and Harris left to meet up with White at a different apartment. They were still at that apartment when they heard someone had been shot. Woods and Harris eventually returned to the Front Street apartment and proceeded to Jackson's apartment from there. Hopson, Davis, Jackson, and defendant later arrived in Clark's car.

¶ 30        About a month later, defendant told Woods about shooting Kirkwood. According to Woods, defendant said when they saw Kirkwood, they parked the car, defendant and Jackson switched seats, and defendant asked someone to hand him a gun. Defendant got out of the car and followed Kirkwood down the street. Defendant then walked up to Kirkwood, shot him three or four times, and ran back to the car. Woods knew that defendant had access to firearms and saw defendant with a .38-caliber revolver on October 30. The gun was thrown under Harris's porch right after the shooting. In November or December, Woods drove Harris and defendant to a lake near Bloomington, where Woods believed defendant threw the .38-caliber revolver into the lake.

¶ 31        After the shooting, defendant was around more often. Defendant said he wanted to keep Davis close and Davis should try to "catch a body, too," which meant that he should also kill someone. Woods was concerned about speaking with the police because he was afraid something would happen to him. He did not give a statement to police until after he was arrested for felony possession of a firearm in March 2020.

¶ 32                              *7. Jack McQueen*

¶ 33        Jack McQueen testified he was a civilian supervisor of the crime intelligence unit in the investigations division of the Bloomington Police Department. The trial court certified McQueen as an expert in gang crime analysis and gang membership identification.

¶ 34        McQueen explained that there are two types of gangs: traditional and hybrid. As relevant to this case, hybrid gangs form locally in a city and use their own hand signs and colors. Hybrid gang members can also be members of traditional street gangs; members of a hybrid gang may be members of different traditional gangs. In Bloomington-Normal, hybrid gangs relevant to this case included the "FBMG 200s," the "Making Money Gang" (MMG), and BBE. MMG and BBE were considered to be the same group because they are closely aligned. The FBMG 200s and MMG/BBE had been rival gangs since 2015. The MMG/BBE hybrid gang is associated with the Gangster Disciples, which is a traditional street gang.

¶ 35        McQueen identified persons as gang members by their use of hand signs and tattoos indicative of gang membership, self-admission, and informants. He explained that using a rival gang's hand signs in a downward fashion is seen as an act of disrespect to that rival gang, the purpose of which is to incite violence. According to McQueen, gang members often boasted about gang involvement on social media, such as displaying hand signs, tattoos, and weapons, and discussing crimes in which they are involved or intend to commit in the future. McQueen explained

that there is a difference between a gang member and what he called a "gang associate," the difference being the level of criminal activity. An associate is allowed to hang around with the gang, use hand signs, participate in events, and speak on behalf of the gang, but he does not participate in street gang crimes, such as shootings or other acts of violence. Once an associate participates in acts of violence, McQueen classifies that person as a gang member. A gang associate would look the same as a gang member to a rival gang member.

¶ 36        McQueen explained Kirkwood and Wright were both gang associates of the FBMG 200s. Wright's brother, Steven Alexander, was a member of the FBMG 200s before he was killed in a homicide in Bloomington in the summer of 2018. Jackson, Davis, Hopson, and White were members of the rival MMG/BBE street gangs. McQueen determined defendant was a member of the Gangster Disciples based on a review of defendant's social media accounts and messages exchanged between defendant and another person via Facebook. Moreover, on defendant's Facebook and Instagram accounts, he purportedly posted images of himself (1) displaying the Gangster Disciples six-pointed star membership insignia and the "pitchfork" hand signs on multiple occasions, (2) dressing in gang colors, (3) displaying weapons, and (4) disrespectfully using rival gang signs in a downward manner.

¶ 37        McQueen testified he reviewed a conversation on Facebook Messenger between defendant and Frederick Bumper, who is a member of the FBMG 200s, of which Alexander had been a member. In a conversation on September 16, 2018, Bumper asked defendant if he had been "smoking Steve," which meant that defendant had been making disrespectful comments about Alexander, who was a rival gang member killed in a 2018 homicide. McQueen opined disrespecting the dead is the ultimate form of disrespect among gang members and can lead to

violence between gangs. The conversation escalated to telling each other where they could be found and to come fight.

¶ 38 On October 8, 2018, defendant and Bumper resumed the conversation and again issued challenges back and forth. Bumper ultimately said defendant was "a b***" and "a nobody," meaning he was weak and not worthy of the rival gang's respect or attention. Defendant responded, "Fight." McQueen opined not only was there pressure or an expectation for defendant to respond to Bumper's disrespect, but it was also required. A response would not necessarily have to be made toward Bumper but could be an act of violence aimed at anyone belonging to the rival FBMG 200s gang. According to McQueen, if a gang member does not respond to a disrespectful act, he will lose face within the gang and be at risk of being attacked by fellow gang members or being thrown out of the gang altogether. Furthermore, he could make himself a target for violence from rival gangs.

¶ 39 8. *Jeff Engle*

¶ 40 Jeff Engle, a detective with the Bloomington Police Department, interviewed defendant on November 19, 2018. Defendant said he had to work on the day of the shooting and had spent the rest of the night at home at Xavier Stokes's house and Harris was the only other person there. Moreover, defendant claimed he did not have a girlfriend. However, Engle knew defendant had been with Clark during a prior traffic stop. Defendant had not seen Jackson since the summer. He only knew of Davis through social media and had never met him in person.

¶ 41 B. Guilty Verdict and Posttrial Proceedings

¶ 42 Following the State's case-in-chief, defendant elected not to testify or present any evidence. The jury found defendant guilty of first degree murder and additionally found defendant personally discharged a firearm that proximately caused Kirkwood's death.

¶ 43    Defense counsel filed a timely posttrial motion, and defendant *pro se* filed several supplemental posttrial motions. Defendant also *pro se* wrote letters to the trial court alleging his counsel was ineffective at trial.

¶ 44    The trial court held a hearing on defendant's posttrial motions on April 14, 2022. At the beginning of the hearing, defense counsel informed the court he did not intend to adopt defendant's supplemental posttrial motions. Following arguments, the court denied defendant's posttrial motion. The court then conducted an inquiry into defendant's *pro se* allegations of ineffective assistance of counsel pursuant to *Krankel*. The court provided defendant the opportunity to expand upon his allegations and asked defense counsel to respond. During his opportunity to speak, defendant complained about his counsel's refusal to adopt the arguments in his supplemental posttrial motion. Following its *Krankel* inquiry, the court reserved its ruling for a written order and set the matter for a sentencing hearing.

¶ 45    On May 16, 2022, the trial court entered a written order concluding none of defendant's allegations showed possible neglect requiring the appointment of new counsel. The court found defendant's allegations were either a matter of trial strategy or legally nonmeritorious.

¶ 46    On June 28, 2022, the trial court sentenced defendant to 50 years in prison, which included a 25-year firearm enhancement. Defendant filed a motion to reconsider his sentence, which the court denied on August 31, 2022.

¶ 47    This timely appeal followed.

¶ 48                              II. ANALYSIS

¶ 49    Defendant presents three arguments on appeal. First, defendant argues the trial court abused its discretion when it admitted evidence of defendant's Facebook Messenger conversation with Bumper because it was too remote and speculative to give defendant a motive

to commit the shooting. Second, defendant claims the trial court erroneously admitted White's and Davis's prior statements to police because they were inadmissible as substantive evidence and for impeachment. Finally, defendant asserts the court failed to conduct a proper *Krankel* inquiry and its conclusion that new counsel need not be appointed was manifestly erroneous.

¶ 50                                A. Evidentiary Issues

¶ 51        We first address defendant's arguments the trial court erroneously admitted (1) defendant's conversation with Bumper via Facebook Messenger and (2) White's and Davis's prior inconsistent statements to police.

¶ 52                          1. *Admissibility of Evidence Generally*

¶ 53        This court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. *People v. Graves*, 2012 IL App (4th) 110536, ¶ 31. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable, or no reasonable person would agree with it. *Id.*

¶ 54        Generally, evidence must be relevant to be admissible, and all relevant evidence is admissible unless otherwise provided by law. *People v. Walker*, 2021 IL App (4th) 190073, ¶ 18. " 'Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *Id.* (quoting Ill. R. Evid. 401 (eff. Jan. 1, 2011)). However, under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011), "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶ 55                       2. *Admission of Facebook Messenger Conversation*

¶ 56 Defendant argues the trial court erroneously admitted evidence of defendant's Facebook Messenger conversation with Bumper because it was "too remote and speculative to give defendant motive to kill Kirkwood," "the inferential connection between the conversation and defendant's purported motive to kill was tenuous," and "had the prejudicial effect of identifying defendant as the shooter to the exclusion of the other gang members in the car," who all had a motive to identify defendant as the shooter. The State counters the court properly admitted the conversation into evidence because it was relevant to the State's theory of defendant's motive for murdering Kirkwood, who shared gang affiliation with Bumper. We agree with the State.

¶ 57 Here, the trial court's admission of defendant's Facebook Messenger conversation with Bumper was not an abuse of discretion because it was relevant to showing the beginning of a sequence of events that established defendant's motive for killing Kirkwood. Although defendant correctly notes the conversation occurred over three weeks before the shooting, it tended to show that tensions were beginning to rise between the two gangs, specifically due to mutual exchanges of disrespect toward deceased members. When viewed in context, Bumper's belief that defendant had disrespected Alexander explained why Wright and his fellow FBMG 200s, in turn, disrespected Jackon's deceased brother, C.J., at the Red & Blue when Hopson, Jackson, Davis, and defendant were there on the night of October 30, 2018. This furthered the State's theory of the case, which was that the commotion caused by the confrontation at the Red & Blue culminated in defendant seeking out Kirkwood to exact revenge and defend C.J.'s name on behalf of the MMG/BBEs. McQueen, who was certified as an expert in street gangs, testified regarding the pressure to violently retaliate when faced with disrespect from rivals and how insulting the deceased was the "ultimate" form of disrespect. Furthermore, we agree with the State that the conversation, alone, was not used to prove defendant was the shooter, as defendant argues in his

brief. Instead, as stated above, it served to chronicle the development of the feud between the two gangs.

¶ 58     Moreover, the probative value of the Facebook Messenger conversation was not substantially outweighed by the risk of unfair prejudice to defendant. This court acknowledges the admission of the conversation helped single defendant out compared to the other gang members who were identified as being in Clark's car before the shooting—*i.e.*, Jackson, Hopson, and Davis—all of whom had a motive to pin the shooting on defendant to lessen their own culpability. However, Jackson, Hopson, and Davis all appeared in custody at trial and were impeached with their prior convictions, and none of them testified defendant was responsible for shooting Kirkwood. The trial court's admission of the Facebook Messenger conversation did not prevent defendant from presenting evidence that undermined the State's theory of the case. Accordingly, it did not result in any unfair prejudice to defendant that would have substantially outweighed the probative value of the evidence.

¶ 59                    3. *Admission of Prior Inconsistent Statements*

¶ 60     Defendant next contends the trial court erred when it allowed the State to introduce evidence of White's and Davis's prior inconsistent statements to the police because the statements were inadmissible both substantively and for impeachment purposes. The State argues to the contrary.

¶ 61     Notwithstanding the rule against hearsay, section 115-10.1 of the Code of Criminal Procedure of 1963 (Procedure Code) (725 ILCS 5/115-10.1 (West 2022)) provides a testifying witness's prior inconsistent statements may be admitted as substantive evidence when the witness is subject to cross-examination and the statement:

"(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording."

For purposes of section 115-10.1, "personal knowledge" means the witness must have actually perceived the events that are the subject of the statement. *People v. McCarter*, 385 Ill. App. 3d 919, 930 (2008). "[E]xcluded from this definition are statements made to the witness by a third party, where the witness has no firsthand knowledge of the event that is the subject of the statements made by the third party." (Internal quotation marks omitted.) *Id.* In other words, "the witness must have observed the events being spoken of, rather than simply hearing about them afterwards." *Id.* In *People v. Fauber*, 266 Ill. App. 3d 381, 390-91 (1994), this court explained the purpose of section 115-10.1 as follows:

"[A] substantive policy reason for section 115-10.1 of the Code was to prevent a turncoat witness from backing away from a former statement made under circumstances indicating it was likely to be true by merely denying the statement.

If the policy of the legislation expressed in section 115-10.1 of the Code is to make prior statements of a turncoat witness admissible, although the truth of the statement is denied by the witness, logic requires that such a statement appearing on its face to be from firsthand knowledge should not be rendered inadmissible merely because the witness testifies at trial that he or she was speaking about what he or she had heard. No case directly on point has been called to our attention, but in cases where prior inconsistent statements have been declared to be inadmissible because the declarant witness was not speaking from personal knowledge, *the lack of knowledge appeared in the prior statement*." (Emphasis added.)

Stated differently, the issue of whether a witness had personal knowledge of the events described is evaluated temporally in the context of the prior inconsistent statement itself; it is not negated by the witness's later claim he lacked such personal knowledge. See *People v. Carlos*, 275 Ill. App. 3d 80, 83 (1995) ("[T]his court has previously declared the admissibility of a prior statement turns on whether it appears on its face to be from firsthand knowledge and *not* from the later testimony of the recanting witness." (Emphasis in original.)).

¶ 62                      a. Davis's Prior Inconsistent Statements

¶ 63            Defendant argues the trial court erroneously admitted Davis's prior statement to police that "Thunder" (*i.e.*, defendant) got out of the car and shot Kirkwood because Davis never claimed to have witnessed defendant kill Kirkwood. Accordingly, defendant's argument continues, Davis had no personal knowledge of the event as required for admission under section 115-10.1 of the Procedure Code. We disagree.

¶ 64            When evaluating Davis's prior statement to the police in context, it was based on his own experience and perception of the events—not on knowledge he overheard or obtained

- 19 -

from a third party. See *McCarter*, 385 Ill. App. 3d at 930. Although officers did not explicitly ask Davis if he saw the shooting with his own eyes, a reasonable interpretation of Davis's statement at the time he made it was that he observed "Thunder" (*i.e.*, defendant) get out of the car and shoot Kirkwood; there is nothing in the statement itself indicating Davis came to know this information any other way than personal experience. At the time, Davis did not qualify his statement by claiming he did not remember what happened, that he was using drugs, or that he was asleep. It was not until his trial testimony that Davis denied seeing anyone kill Kirkwood. Despite defendant's assertions, Davis's purported lack of personal knowledge did not appear in the prior statement itself, but rather in his trial testimony. See *Fauber*, 266 Ill. App. 3d at 391. Accordingly, the trial court did not abuse its discretion when it admitted Davis's prior inconsistent statements to police as substantive evidence under section 115-10.1 of the Procedure Code.

¶ 65        Defendant also contends Davis's prior inconsistent statements were inadmissible for impeachment purposes because they did not affirmatively damage the State's case. Instead, defendant claims Davis's inability to recall the events merely failed to support the State's position at trial. Because we have already concluded Davis's statements were substantively admissible under section 115.10.1 of the Procedure Code, we need not address whether it was admissible for impeachment purposes.

¶ 66                                b. White's "Real Killer" Statement

¶ 67        Defendant next contends the trial court erroneously admitted White's April 26, 2019, statement in which he told detectives that defendant had called himself a "real killer," "like he had really killed someone." Specifically, defendant contends the statement was neither admissible substantively nor for impeachment purposes because it was not inconsistent with his

trial testimony. Even assuming defendant is correct, we conclude White's statement defendant called himself a "real killer" was nonetheless admissible on other grounds.

¶ 68    This court may affirm on any basis supported by the record (*People v. Watts*, 2022 IL App (4th) 210590, ¶ 67), and the record shows White's testimony defendant called himself a "real killer" was admissible as an opposing party statement. Generally, "[a]ny statement by an accused person, unless excluded by the privilege against self-incrimination or other exclusionary rules, may be used against him as an admission." *People v. Aguilar*, 265 Ill. App. 3d 105, 110 (1994). Specifically, Illinois Rule of Evidence 801(d)(2)(A) (eff. Oct. 15, 2015) provides that an out-of-court statement is not hearsay if it "is offered against a party and is *** the party's own statement, in either an individual or a representative capacity." Essentially, "any and every statement by an accused person may be used against that person as an admission unless excluded by other evidentiary bars." *Aguilar*, 265 Ill. App. 3d at 110. Additionally, unlike section 115-10.1 of the Procedure Code, Rule 801 contains no personal knowledge requirement pertaining to the content of the defendant's own statements. See Ill. R. Evid. 801(d)(2)(A) (eff. Oct. 15, 2015). Here, White agreed defendant had called himself a "real killer," despite claiming it was merely something everyone said in the "urban community" and that he did not know if defendant killed Kirkwood. Accordingly, it was permissible for the State to elicit testimony from White regarding defendant's own statement he was a "real killer."

¶ 69                c. Other Applications of Section 115-10.1

¶ 70    Having found Davis had personal knowledge regarding his prior inconsistent statement and White's "real killer" testimony was admissible under Rule 801, we have no need to opine on how section 115-10.1 of the Procedure Code might apply in circumstances other than those presented in this case. We therefore express no opinion on the special concurrence.

¶ 71                                    B. *Krankel* Inquiry

¶ 72            Finally, defendant asserts this court should remand for further proceedings because (1) the trial court failed to conduct a sufficient inquiry into defendant's *pro se* claim of ineffective assistance of trial counsel and (2) several of defendant's allegations supported a claim of ineffective assistance of counsel, requiring new counsel to be appointed to represent him. The State responds the court's inquiry was proper and the appointment of new counsel was not required. We agree with the State.

¶ 73            When confronted with a defendant's *pro se* allegations of ineffective assistance of counsel, the Illinois Supreme Court has established required procedural steps for a trial court to follow in *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003) (noting the rule developed post-*Krankel*):

> "New counsel is not automatically required in every case in which a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel. Rather, when a defendant presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed."

The trial court can conduct its neutral, nonadversarial inquiry into the defendant's claims of ineffective assistance in one or more of the following ways: "(1) questioning the trial counsel, (2) questioning the defendant, and (3) relying on its own knowledge of the defense counsel's performance in the trial." *People v. Peacock*, 359 Ill. App. 3d 326, 339 (2005).

¶ 74            "Where a defendant's claims are conclusory, misleading, or legally immaterial, or do not bring to the trial court's attention a colorable claim of ineffective assistance of counsel, the trial court may be excused from further inquiry." *People v. Bobo*, 375 Ill. App. 3d 966, 985, 874 N.E.2d 297, 315 (2007). This court reviews whether the trial court properly conducted a *Krankel* inquiry *de novo*. *People v. Jolly*, 2014 IL 117142, ¶ 28. If the trial court properly conducted the *Krankel* inquiry and reached a determination on the merits of the defendant's *Krankel* motion, the trial court's decision is reviewed for manifest error. *People v. Jackson*, 2020 IL 124112, ¶ 98. The court's decision is manifestly erroneous if the error is "clearly evident, plain, and indisputable." *Id.*

¶ 75                    1. *Sufficiency of* Krankel *Inquiry*

¶ 76            Defendant argues the trial court's *Krankel* inquiry was insufficient because it failed to employ the proper standard of review. Specifically, defendant claims "the court's statements suggested it believed that there could be no possible neglect based on defendant's allegations if counsel gave *any* explanation for his trial strategy." Therefore, defendant's argument continues, "it did not consider whether counsel's decision was reasonable under the circumstances," essentially concluding that "because counsel's decisions 'pertained to trial strategy,' they were not reviewable." (Emphasis in original.) The State responds defendant misinterprets the court's decision and it employed the proper standard of review.

¶ 77            Defendant's assertion is based on the following statement in the trial court's written order: "The function of a *Krankel* hearing remains simply to decide whether to appoint new counsel to investigate Defendant's claims of ineffective assistance of counsel and not to reach the merits of Defendant's ineffective assistance claims." Defendant notes the Illinois Supreme Court's decision in *People v. Roddis*, 2020 IL 124352, ¶ 61, held that "even in preliminary *Krankel*

inquiries, a trial court must be able to consider the merits in their entirety when determining whether to appoint new counsel on a *pro se* posttrial claim of ineffective assistance of counsel." (Emphasis omitted.)

¶ 78 Although the trial court stated in its written order it was not to consider the merits of defendant's ineffective assistance claims, when read in conjunction with the rest of its written order, and when considered in the context of its inquiry process at the April 14, 2022, hearing, the record shows its inquiry was proper. At the hearing, the court allowed defendant to expand upon his allegations, provided an opportunity for defense counsel to respond, and excluded the State from participation. In its written order, in addition to its citation to *Patrick*, the court also cited *People v. Johnson*, 159 Ill. 2d 97, 126 (1994), and *Moore*, 207 Ill. 2d at 78, as its guiding principles in assessing defendant's claims, stating a defendant's claim lacks merit if his allegations are "(1) conclusory, (2) misleading, (3) legally immaterial, or (4) pertaining solely to an issue of trial strategy." As relevant to defendant's claim the court "did not consider whether counsel's decision was reasonable under the circumstances," the court specifically explained that "[m]atters of trial strategy are if the allegations and factual basis *** could not support a claim that trial counsel was objectively unreasonable." By way of example, in applying these considerations to defendant's allegation counsel was ineffective for failing to call Stokes as an alibi witness, the court explained counsel employed a valid trial strategy as follows:

> "This witness was investigated by counsel. The case against Defendant was largely circumstantial. Counsel made a decision not to call a witness who would only provide contrary information to the State's witnesses and who potentially had [credibility] issues. This could and likely would have distracted away from Defendant's stronger defenses."

The court's written order establishes when it considered whether defendant's allegations pertained to trial strategy, it specifically evaluated whether such a strategy was reasonable under the circumstances of this particular case—not whether counsel's decisions were a result of "any" stated strategy. The court applied the proper standard of review and conducted a sufficient *Krankel* inquiry despite its one-off statement that incorrectly framed the court's ability to consider the merits of a defendant's claims of ineffective assistance of counsel.

¶ 79                                  2. *Merits of the Trial Court's Decision*

¶ 80            Defendant further argues the trial court's ultimate decision new counsel should not be appointed to represent defendant was manifestly erroneous because several of his *pro se* allegations could have supported a claim of ineffective assistance of counsel. Specifically, defendant claims the following acts and omissions of counsel could have supported such a claim: (1) counsel failed to call Stokes as an alibi witness; (2) counsel failed to contact a confidential witness who, according to discovery documents, claimed they heard Jackson tell someone on the phone, "Don't make me smoke you like I did [Kirkwood]"; (3) counsel failed to address that Davis wrote to defendant before trial and said, among other things, he lied about defendant, he knows defendant is innocent, he was on drugs, and the police told him things; and (4) counsel failed to investigate affidavits from two witnesses, Gemonte and Jahni Lyons, who averred they heard Woods and Jackson discussing the fact defendant was innocent while lodged in the McLean County jail. The State responds the court's decision was not manifestly erroneous. We agree with the State.

¶ 81            In its written order, the trial court addressed defendant's aforementioned claims as follows:

"8. Defendant initially asserts trial counsel failed to call an alibi witness who was Defendant's cousin, Xavier Stokes. Defendant asserts this witness would have contradicted the State's key witness and would have established Defendant's whereabouts at the time the crime was committed. Defendant's counsel asserts he met with the witness and the witness['s] recollection was weak and problematic. Counsel asserted that the witness did not make a strong appearance and had already given a statement. The witness had a felony conviction that would be problematic for [credibility]. Counsel stated that it was a strategy decision not to call him. The Court finds Defendant's counsel's decision not to call Xavier Stokes pertains to trial strategy. This witness was investigated by counsel. The case against Defendant was largely circumstantial. Counsel made a decision not to call a witness who would only provide contrary information to the State's witnesses' and who potentially had [credibility] issues. This could and likely would have distracted away from Defendant's stronger defenses. The Court finds this decision amounts to trial strategy.

\* \* \*

12. Defendant claims counsel failed to call CS 1350, who heard Quinton Jackson make a statement, 'Don't make me smoke you like I did Tre.' Defendant's counsel stated this was a tactical decision as he did not want to get 'into a battle of the [confidential sources].' He wanted to make the State's CS look bad. He stated he did not want to assert to the trier of fact that they should not believe the State's CS but they should believe the Defendant's CS's hearsay statement. The Court finds this claim amounts to trial strategy.

* * *

18. Defendant claims that counsel was ineffective when he failed to bring up a letter from Darien Davis that stated, 'he lied on me' and that he 'knows he is innocent' and that he was 'off all kinds-of drugs.' Defendant's counsel stated that the letter was not an affidavit and based upon his experience this type of evidence would not have been effective and would have distracted from Defendant's theory and strategy. The Court finds this claim pertains to trial strategy.

19. Defendant claims that counsel was ineffective for failing to adopt his *pro se* filings [containing Gemonte and Jahni Lyons's affidavits] to supplement counsel's post-trial motions. Counsel filed detailed post-trial motions which addressed the legal issues in which counsel believes had a legal basis. The matters raised in Defendant's *pro se* filings were either addressed by counsel or legally immaterial. The Court finds the claim pertains to strategy and legally immaterial."

¶ 82     We conclude the trial court's reasoning as to why defendant's claims were either legally immaterial or pertained to matters of sound trial strategy was not "clearly evident, plain, and indisputable" error. *Jackson*, 2020 IL 124112, ¶ 98. The record shows the court carefully considered the allegations defendant asserts would have supported a claim of ineffective assistance of counsel. Specifically, counsel reasonably believed having Stokes and CS1350 testify would not have helped defendant's case because they both had credibility issues. Also, having the confidential source testify could have devolved into a confusing "battle" of the confidential sources. Furthermore, Davis's letter was not a notarized affidavit and was essentially duplicative of his trial testimony, in which he claimed not to know who shot Kirkwood and that he was on drugs on the evening of the shooting. Finally, as the State notes in its brief, the Lyonses' affidavits

contained hearsay statements from Woods and Jackson that likely would not have been admissible. Even if they had been introduced and admitted, this evidence would have threatened defense counsel's strategy of focusing upon the credibility issues of the State's witnesses. The court's well-reasoned conclusion that none of these claims showed neglect of defendant's case necessitating the appointment of new counsel did not constitute a "clearly evident, plain, and indisputable" error. *Id.*

¶ 83                                    III. CONCLUSION

¶ 84            For the reasons stated, we affirm the trial court's judgment.

¶ 85            Affirmed.

¶ 86            JUSTICE STEIGMANN, specially concurring:

¶ 87            Forty years ago, the Illinois General Assembly enacted section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2022)). That new statute was designed to—and did—dramatically strengthen the truth-seeking processes of criminal trials. That statute provided for the first time in Illinois that the trier of fact in a criminal case would be permitted to hear a statement that a witness made relevant to a criminal prosecution when the witness testified at trial inconsistently with that earlier statement. However, the trier of fact would be permitted to hear and consider as substantive evidence that witness's prior inconsistent statement *only* under certain circumstances as provided in the statute. In other words, the statute explicitly sets forth the kind of foundation the proponent of a prior inconsistent statement must present for that statement to be admissible.

¶ 88            Section 115-10.1 has achieved its goal of strengthening the truth-seeking processes of the criminal trial, and experience shows that jurors typically have no trouble deciding which is more believable: (1) the statement the witness made on the night in question regarding the

defendant's criminal behavior or (2) the witness's trial testimony that is inconsistent with his earlier statement when the witness claims (a) he does not remember the defendant's criminal behavior that was the subject of his earlier statement, or (b) the earlier statement was not correct. Judges and lawyers now have dozens of decisions from Illinois courts of review interpreting that statute and clarifying how it should work.

¶ 89 Nonetheless—as shown by the present case—confusion, uncertainty, and a lack of understanding still too often are present when it comes to the application of this important statute. Accordingly, although I fully agree with my distinguished colleagues in the majority, I write this special concurrence to (hopefully) provide some guidance regarding how section 115-10.1 can and should be used.

¶ 90 I. "PERSONAL KNOWLEDGE" IS NOT A REQUIREMENT FOR THE ADMISSIBILITY OF STATEMENTS UNDER SECTION 115-10.1(c)(1)

¶ 91 A. The Text of Section 115-10.1

¶ 92 Section 115-10.1 reads as follows:

"Admissibility of Prior Inconsistent Statements. In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording.

Nothing in this Section shall render a prior inconsistent statement inadmissible for purposes of impeachment because such statement was not recorded or otherwise fails to meet the criteria set forth herein." *Id.*

¶ 93    Section 115-10.1 is short and to the point. For any prior statement of a witness to be admissible under that section, the statement must be inconsistent with the witness's testimony at the hearing or trial (subsection (a)) and the witness must be subject to cross-examination (subsection (b)).

¶ 94    Subsection (c) then describes the foundation that the proponent of the prior inconsistent statement must show for the statement to be admissible. Subsection (c) is divided into (c)(1) and (c)(2) statements. A subsection (c)(1) statement is a statement that was made under oath at a trial, hearing, or other proceeding. A subsection (c)(2) statement is a statement that "narrates, describes, or explains an event or condition *of which the witness had personal knowledge*."

(Emphasis added.) *Id.* § 115-10.1(c)(2). Subsection (c)(2) also requires that the proponent of the statement be able to present extrinsic evidence that the statement was, in fact, made.

¶ 95                    B. The Difference Between (c)(1) and (c)(2) Statements

¶ 96          In this case, defendant argues this court should reverse defendant's murder conviction and remand for a new trial because the State, as the proponent of the prior inconsistent statements of Davis and White, did not satisfy the subsection (c)(2) requirement that those witnesses had "personal knowledge" of an event or condition about which they testified. This is an argument that defendants often raise in cases in which the State has introduced prior inconsistent statements as substantive evidence under subsection (c)(2). And, occasionally, that argument has prevailed.

¶ 97          However, police officers and prosecutors should be aware that if they can lay a foundation for the admissibility of a prior inconsistent statement under subsection (c)(1), they need not worry about whether the witness has "personal knowledge" because such a showing is not required.

¶ 98          Under subsection (c)(1), the *only* requirement for admissibility is that the prior inconsistent statement "was made under oath at a trial, hearing, or other proceeding." *Id.* § 115-10.1(c)(1). Accordingly, prosecutors and investigating police officers should consider how they can lay a foundation for the admission of a prior inconsistent statement under that subsection without being concerned about the personal knowledge requirement of subsection (c)(2).

¶ 99          C. What Is a "Trial, Hearing, or Other Proceeding" Under Subsection (c)(1)?

¶ 100          Experienced police officers and prosecutors should not be surprised that witnesses to criminal activities frequently change their in-court testimony from what they told investigators on the night in question. For instance, in a murder case in which the defendant is charged with

shooting the victim at 2 a.m. in a tavern parking lot, one would not expect any witnesses to that shooting to be members of the local Rotary Club. Instead, any witnesses are likely to be part of the same milieu as the shooter, as again reflected in the present case.

¶ 101     In this case, after Davis and White told the police what they saw regarding the shooting of Kirkwood, the risk that Davis and White would change their testimony was clearly apparent, and the police should have taken steps to ensure the admissibility of those statements under section 115-10.1 if Davis or White were to testify inconsistently with them.

¶ 102                    1. *Grand Jury Proceedings*

¶ 103     What steps could they have taken? In Cook County, that answer is easy because Cook County has a grand jury sitting literally every day at the Leighton Criminal Courts Building at 26th Street and California Avenue in Chicago. In a Cook County shooting case in which a witness from the same milieu as the accused shooter makes statements incriminating the shooter, the Cook County prosecutor could subpoena that witness before the grand jury and get his statements under oath perhaps that same day. Then, if the witness changes his testimony at trial, a transcript containing his prior inconsistent statements before the grand jury would be admissible as substantive evidence.

¶ 104     Although McLean County (the trial venue in this case) does not have a sitting grand jury every day, a superseding indictment nevertheless was returned in this case. That means that a grand jury was empaneled in McLean County to hear evidence that enabled the State to charge defendant with first degree murder. The State could have called Davis and White to testify before the McLean County grand jury. And there is no reason to think they would not have told the grand jurors the same thing they told the investigating police officers.

¶ 105 Had Davis and White testified before the grand jury and told the same story they told the police, defendant could not have argued on appeal that their prior inconsistent statements were improperly admitted on the ground that they did not have "personal knowledge" of the event those statements referred to—namely, the shooting of Kirkwood. That is because a subsection (c)(1) prior inconsistent statement—namely, a statement made under oath to a grand jury—does not require the declarant to have personal knowledge about the event or condition about which he was testifying.

¶ 106 However, a grand jury is not the only option for prosecutors to secure a witness's (c)(1) statement. Even if a grand jury is not available, a witness to a murder could be subpoenaed to testify under oath at some other "trial, hearing, or other proceeding," which would similarly meet the requirements under subsection (c)(1) for the admissibility of a prior inconsistent statement.

¶ 107                                         2. *Warrant Proceedings*

¶ 108 Two examples of such hearings would be (1) a hearing on the State's request for an arrest warrant and (2) a hearing on the State's request for a search warrant of a person, residence, or vehicle.

¶ 109 In each of these examples, the police or prosecutors would bring the witness before a judge, have the witness sworn, and then have the witness answer questions about the criminal activity of the defendant. That witness's testimony in such a hearing could then be the basis for the admissibility of a subsection (c)(1) statement if the witness later changes his story at trial.

¶ 110 I emphasize that "a hearing" before a judge occurs literally anywhere the judge is present and engaged in a judicial function. It certainly need not be in the courthouse.

¶ 111    In fact, when I was a trial judge many years ago, I sometimes had occasion to drive late at night to the parking lot of a closed business in Champaign or Urbana to meet with police officers and a witness in a police car. I got in the back seat of the police car, swore in the witness, and then went over the complaint for search warrant the officers and prosecutor had prepared based upon the witness's statements to them. I questioned the witness about the averments in the complaint for search warrant attributed to him, and if I was satisfied, I would then issue the search warrant based upon his sworn complaint.

¶ 112    Forty years ago, there was no need to record those back-seat proceedings. However, doing so now should be no problem, given the ubiquity of cell phones that can be used to make audio and video recordings of those proceedings.

¶ 113    Even though the police are authorized to make an arrest without a warrant when they have probable cause to believe that a person has committed a criminal offense, they need not take that course of action. Instead, they can bring a witness who partially or fully provides probable cause—in this case, Davis and White—before a judge at the courthouse or elsewhere, have the witness sworn in, and then question the witness to elicit incriminating information about the defendant, which would then justify the judge's issuing a warrant for the defendant's arrest.

¶ 114    One of the reasons for my writing this special concurrence is that in the 40 years since the enactment of section 115-10.1, I do not recall ever seeing the police or prosecutors use a hearing at which a request for an arrest warrant or search warrant is sought to lay the foundation under subsection (c)(1) for the later admission of a prior inconsistent statement. Hopefully, this special concurrence will raise awareness of alternate or unconventional methods of utilizing section 115-10.1.

¶ 115    II. THE "DISAPPOINTING V. DAMAGING" DICHOTOMY

- 34 -

¶ 116     This case also reveals continuing confusion regarding when a prior statement by a witness that is inconsistent with the witness's trial testimony may yet be admissible for impeachment purposes even though the prior statement would not be admissible as substantive evidence under section 115-10.1. I hope to provide some clarification regarding this question so that prosecutors and judges will understand the limitations on the admissibility of such statements for impeachment.

¶ 117     Perhaps the best way to explain the "damaging vs. disappointing" dichotomy is to use the following factual scenario. Defendant John Smith is charged with the first degree murder of Henry Carter. The State alleges that Carter and Smith were arguing in a tavern parking lot at midnight when Smith pulled a gun, shot Carter repeatedly, and killed him.

¶ 118     One of the witnesses the State plans to call to prove this charge is Charles Smedley, who gave a statement to police officer William Baker in which Smedley said (1) he saw Smith and Carter argue in the parking lot before the shooting, (2) he saw Smith pull a gun and shoot Carter repeatedly, (3) Carter was not holding a gun or any weapon when Smith shot him, and (4) Carter had made no movement before Smith shot him as if Carter were reaching for a gun on his person.

¶ 119     For whatever reason, Officer Baker never recorded the statement he took from Smedley, nor did Officer Baker ask Smedley to write out his statement or sign it. The case against Smith proceeds to trial. Assume that Smedley testifies as follows as a State's witness in the following different scenarios.

¶ 120                    Scenario 1

¶ 121     Smedley testifies that because he was "high on Jack Daniels and reefer," he barely remembers anything about the night of the shooting or being present in the tavern parking lot, and he has no memory of who shot whom or why.

¶ 122                                    Scenario 2

¶ 123          Smedley testifies that he recalls the night in question and remembers being present in the tavern parking lot when Carter was shot. The State then asks, "Did you see who shot Carter?" Smedley responds, "Yes. The shooter was Edward Brown."

¶ 124          The difference between these two scenarios is stark, as is the effect of Smedley's testimony in Scenario 2 upon the State's case.

¶ 125          In Scenario 1, the prosecutor has been *disappointed* because an eyewitness to the murder did not testify consistently with the statement he made to an investigating officer the night the shooting occurred. But the State's case is no worse off than it was before Smedley was called to the stand. That is, although Smedley's testimony in Scenario 1 did not help the State in its quest to have Smith convicted of murdering Carter, Smedley's testimony did nothing to hurt the State's case.

¶ 126          Scenario 2 is entirely different. In that scenario, not only is the State disappointed that Smedley did not testify consistently with his statement to the investigating officer, the State's case has been significantly and affirmatively damaged. That is because Smedley has identified someone other than John Smith, the defendant standing trial, as the actual shooter who caused the death of Carter. Smedley's testimony on that point, alone, might be enough to cause jurors to have reasonable doubts about the guilt of the defendant on trial—namely, Smith.

¶ 127          Thus, in this very limited situation, because the State's case has now been *affirmatively damaged*, the State may be permitted to elicit Smedley's prior statement to Officer Baker in which Smedley identified Smith as the shooter, not Edward Brown. To do so, the State must confront Smedley with his prior inconsistent statement and if he denies making that statement to Officer Baker, then the State must be prepared to prove it up by calling Officer Baker.

¶ 128 However, in this scenario—which, I emphasize, is not likely to occur—the State *may not* argue to the jury that Smedley's prior inconsistent statement—namely, the statement he made to Officer Baker in which he identified defendant Smith as the shooter—could be considered by the jury as substantive evidence. In other words, the State *may not* argue to the jury that part of the evidence proving defendant Smith shot the victim was the statement that Smedley made to Officer Baker that night. If the State were to do so and the defendant was convicted, that argument—by itself—might be enough to constitute reversible error.

¶ 129 I am fully aware that a jury will have difficulty understanding how Smedley's prior inconsistent statement may be used only to impeach his testimony at trial and not as substantive evidence. I am also aware of the difficulty the trial court and defense counsel might have in trying to get the jury to understand that concept. Nonetheless, the important point is that the State must not suggest in any way to the jury that Smedley's prior inconsistent statement can be considered by the jury as part of the evidence showing that defendant Smith killed the victim.

¶ 130 The following cases further explain the "disappointing v. damaging" dichotomy: *People v. Fillyaw*, 409 Ill. App. 3d 302 (2011); *People v. Blakey*, 2015 IL App (3d) 130719, ¶ 50, in which a more recent panel of the Third District declined to follow the aberrational earlier decision of the Third District in *People v. Leonard*, 391 Ill. App. 3d 926 (2009), in which the Third District failed to appropriately distinguish between statements that damaged the State's case, as opposed to those that were merely disappointing; *People v. Singleton*, 367 Ill. App. 3d 182, 191 (2006); and *People v. Donegan*, 2012 IL App (1st) 102325.

¶ 131 I hope this special concurrence will prove helpful to the judges and lawyers dealing with the admissibility of prior inconsistent statements under section 115-10.1.

*People v. Thornton*, **2024 IL App (4th) 220798**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 19-CF-600; the Hon. John Casey Costigan, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Santiago A. Durango, and Adam N. Weaver, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Erika Reynolds, State's Attorney, of Bloomington (Patrick Delfino and David J. Robinson, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |