NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230746-U

NO. 4-23-0746

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 19, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| CHRISTOPHER JAMES SANDERS, | ) | No. 21CF31 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Katherine S. Gorman, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Harris and Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed, concluding (1) trial counsel's failure to object to the admission of defendant's cousin's prior inconsistent statement incriminating defendant was not tantamount to ineffective assistance of counsel; (2) the trial court was not obligated to conduct a *Krankel* inquiry into defendant's *pro se* posttrial claim of ineffective assistance of counsel when the court was not aware of the claim; and (3) the court did not deny defendant a fair sentencing hearing.

¶ 2     Following a jury trial in June 2023, defendant, Christopher James Sanders, was convicted of first degree murder for the fatal beating and strangulation of his girlfriend, Mona Ellison, in January 2021 (720 ILCS 5/9-1(A)(1) (West 2020)). In finding defendant guilty, the jury concluded the State had proven the offense was accompanied by brutal and heinous behavior indicative of wanton cruelty. The trial court sentenced defendant to natural life imprisonment.

¶ 3        Defendant appeals, arguing (1) he was denied his constitutional right to the effective assistance of counsel, (2) his *pro se* posttrial claim of ineffective assistance of counsel required the trial court to either conduct a *Krankel* inquiry (see *People v. Krankel*, 102 Ill. 2d 181 (1984)) or obtain his waiver of said inquiry, and (3) the court denied him a fair sentencing hearing. For the reasons that follow, we affirm.

¶ 4                                I. BACKGROUND

¶ 5                                A. The Charges

¶ 6        On February 2, 2021, the State charged defendant by indictment with two counts of first degree murder in connection with the fatal beating and strangulation of his girlfriend, Mona Ellison, on January 20, 2021 (720 ILCS 5/9-1(A)(1), 9-1(A)(3) (West 2020)). Count I alleged defendant "without legal justification, strangled and struck Mona Ellison knowing such acts created a strong probability of death or great bodily harm." Count II alleged defendant "without legal justification and with the intent to kill Mona Ellison, strangled and struck [her]," thereby causing her death. Both counts alleged the actions at issue reflected "exceptionally brutal or heinous behavior indicative of wanton cruelty."

¶ 7                                B. Jury Trial

¶ 8        Defendant's jury trial was conducted from June 5 to June 7, 2023.

¶ 9                                1. *The State's Evidence*

¶ 10                               a. Officer Kenneth Lopez

¶ 11        Peoria police officer Kenneth Lopez responded to a missing person call at Ellison's residence in Peoria on January 20, 2021. Officer Lopez spoke with Brett Zahner, who reported not having seen Ellison in approximately three days. Zahner stated he believed Ellison was missing because "groups of people had stopped by her house also looking for her." Zahner

had gone inside the house, but nobody was there. Officer Lopez and a sergeant went into the house through an unlocked back door. In an upstairs bedroom, Officer Lopez discovered a cell phone on Ellison's bed. Officer Lopez explained he called the number for that phone before he went to the house "with hopes that [he] would get an answer." When Officer Lopez did not get an answer, he called again, whereupon the phone "lit up."

¶ 12   Eventually, Officer Lopez left the house and went to defendant's residence, which was approximately six to seven blocks away. Once there, Officer Lopez observed a three-wheeled green pushcart with "a red blood-like stained substance on the handles *** [and] on the actual seated portion of the cart." Officer Lopez informed his supervisor, and the crime scene unit "came out and processed the scene." On January 23, 2021, Officer Lopez went to the residence of defendant's cousin, Perry Sanders, which was approximately four to five blocks away from defendant's residence. On the exterior of the rear of the building, Officer Lopez observed a "red blood-like stained substance on a pole as well as [on] the stairwell leading to the basement."

¶ 13   b. Brett Zahner

¶ 14   Brett Zahner lived directly across the street from Ellison. Zahner had known Ellison for approximately two years and saw her "almost every day." In January 2021, Zahner became concerned about Ellison after "[a] couple of her friends stopped by [his] house looking for her, thinking she might be over." Zahner and the other individuals went to Ellison's residence, noticed the doors were unlocked, and went inside. Zahner discovered Ellison's cell phone on her bed upstairs, and "knew that was unusual" because "that phone never left her hand." After checking the house for Ellison, Zahner saw a black car pull up in front. People exited the car and walked up the driveway towards the back door. (Zahner did not believe

defendant was among these people because he "didn't get that close.") Zahner caught up with them and asked if he could help them. "And they looked at [him] and said, Is [Ellison] home?" Zahner said no. They "left promptly after that" without going inside. Zahner then called the police.

¶ 15    Zahner explained Ellison was a caretaker for his brother. Zahner had last seen Ellison on either the Sunday or Monday preceding Wednesday, January 20, 2021. On that occasion, Zahner went across the street to Ellison's residence to retrieve the keys to his brother's van, which Ellison would drive to do errands for Zahner's brother. After Zahner knocked on the door, Ellison opened the door "and just cracked it a very little." Zahner thought, "well, that was odd," because they were friends. Ellison returned the keys to Zahner, "but she just cracked the door just enough to slide the keys through." Ellison did not say anything to Zahner—"[n]ot a word." On cross-examination, Zahner testified he did not see defendant at Ellison's residence. Ellison "didn't open the door enough to see anything actually."

¶ 16                    c. Tyronda Sanders

¶ 17    Defendant's cousin, Tyronda Sanders, lived near defendant in January 2021. At approximately 6:30 a.m. on January 20, 2021, while outside as her son was boarding the school bus, Tyronda observed defendant rolling a cart down the street. The cart appeared to contain blankets. According to Tyronda, defendant said "he was doing laundry." Tyronda felt this was "nothing out of the ordinary." Later that day, after receiving a phone call about Ellison, she and Perry went to Ellison's residence. They got a ride there in a "black sedan" driven by a person who gives Tyronda rides. While there, Tyronda spoke to a police officer who was already at the house.

- 4 -

¶ 18                                      d. Sergeant Matthew Mocilan

¶ 19        Peoria police sergeant Matthew Mocilan spoke with Tyronda on January 21, 2021, in connection with his investigation into Ellison's disappearance. During this conversation, Tyronda stated she saw blood on the handle of the cart in front of defendant's residence and defendant was wearing "a red sweater with a brown coat with pants with a white stripe on the side." The body worn camera video of this conversation was played to the jury.

¶ 20                                      e. Steve Ballard

¶ 21        Steve Ballard lived next door to defendant. One morning in January 2021, Ballard saw a vehicle from Big Daddy Cab pull up to defendant's residence. Ballard observed defendant standing over a large bag before getting in the cab. Eventually, he put this bag in the trunk of the cab, got in, and left.

¶ 22                                      f. Christopher Watts

¶ 23        Christopher Watts was a cab driver for Big Daddy Cab. At approximately 7 a.m. on January 20, 2021, Watts picked up a passenger at defendant's address. Watts was informed by his dispatcher he was the "second or third cab that had been dispatched to that location, because the previous drivers got tired of waiting for the person to come out, and they left." Prior to his arrival, Watts called the passenger, who "gave [him] this big speech about how he had to go do laundry, or him and his roommate's washer [and] dryer had broken." Upon arrival, Watts called again. Eventually, the passenger exited the residence and "was pushing, looked like an oversized seed spreader or wheelbarrow full of bags through the front yard." The passenger alternated between pushing and pulling. Watts observed the passenger to be "[s]truggling" with maneuvering this object, "[l]ike it was heavy." It took this passenger approximately six to seven minutes to reach the cab. Watts took a picture of the passenger. The passenger "was having a

pretty tough time getting his belongings in the back" of the cab. The passenger asked Watts if he could lay the backseat down "so he had enough room to get them in the car." Watts asked the passenger if he wanted any help, "[a]nd he completely flipped out." The passenger "[d]id not want me touching his bags, didn't want any help, nothing like that." Watts found this "odd because most people don't refuse our help." Once they reached their destination, an "apartment building on [a] hill" in East Peoria, Watts backed up the driveway to the top of the hill. The passenger paid and unloaded his bags. Upon Watts asking again if he would like help, the passenger "flipped out just like he did the first time" and "didn't want [Watts] touching his stuff." When Watts left, the unloaded bags were sitting in the driveway.

¶ 24    The next morning, Watts's manager informed him detectives wanted to speak with him. Watts took the detectives to where he dropped the passenger off the day before. Later that day, detectives came to Watts's residence and showed him a photo array. Watts identified the passenger from the day before as defendant. Later, Watts was shown a second photo array and again identified defendant.

¶ 25                              g. Sergeant Todd Leach

¶ 26    On January 21, 2021, in connection with the investigation into Ellison's disappearance, Peoria police sergeant Todd Leach went to the building in East Peoria at which Watts dropped off defendant. Sergeant Leach explored the wooded area behind the building. A detective directed Sergeant Leach's attention to an "object by a downed tree" located "about 50 yards from the street behind the residence up on the hillside." The "object" was covered with a tarp with leaves on top. Sergeant Leach assisted with securing the scene so it could be "turned over to the violent crime detectives."

¶ 27                                    h. Officer Scott Bowers

¶ 28          Peoria police officer Scott Bowers went to this same wooded area in East Peoria on January 21, 2021, to take photographs and process the scene other officers previously investigated. Officer Bowers was directed to the area of the porch and air conditioner located at the rear of the building. While there, Officer Bowers discovered "a pair of corduroy pants that had [a] reddish-colored stain on the legs," a white T-shirt, a green T-shirt, and a "tan[-]like winter button-up jacket" with "numerous stains" on it. Officer Bowers also discovered a "floral design fitted bedsheet that had items of clothing, pieces of carpet, [and] a tote with some foam in it as well." There was "a pair of blue jeans and a gray sweatshirt that were sitting on top." Officer Bowers went to this same area again later that day and went "deeper" into it than before. Other officers directed Officer Bowers to an area where a human body was found. Bowers also found a blue sleeping bag with "possible reddish-color stains." Clumps of hair were found on the sleeping bag. The deceased individual was determined to be Ellison. Officer Bowers and Officer Paul Tuttle attended the autopsy.

¶ 29                                    i. Dr. Amanda Youmans

¶ 30          Dr. Amanda Youmans was the forensic pathologist who conducted Ellison's autopsy on January 22, 2021. Dr. Youmans cataloged an extensive array of injuries to Ellison's body. Ellison's injuries included (1) a fracture to the hyoid bone in her neck; (2) severe fractures to her nose; (3) a fracture and stab wound to her left cheek bone; (4) stab wounds in her neck, back, and right breast; (5) severe fractures to her ribs; (6) blunt force injuries to her abdomen; (7) bruises and abrasions to her scalp, face, neck, breasts, back, arms, hands, and legs; (8) a stab wound into the muscles of her left thigh; and (9) a cut to the muscles of her left big toe. The fingernails on Ellison's left hand were "broken and chipped," which Youmans testified was

"consistent with defensive injuries" Ellison sustained. Youmans testified Ellison was alive for all these injuries. Ellison's cause of death was determined to be strangulation, with blunt force injuries as contributing factors.

¶ 31                                    j. Officer Brittany Martzluf

¶ 32          Peoria police officer Brittany Martzluf was sent to defendant's residence on January 20, 2021, to photograph the residence and the cart. Defendant's residence was "in a great state of disarray," with clutter and garbage strewn about. Officer Martzluf observed a "red blood-like substance" on various areas of defendant's residence, including the railing of a stairwell, the door at the bottom of the stairwell, the frame of a door at the top of the stairs, and a bedroom light switch.

¶ 33                                    k. Officer Clay Blum

¶ 34          Peoria police officer Clay Blum went to Perry's residence on January 23, 2021, in connection with the investigation into Ellison's homicide. Officer Blum observed "red blood-like stains" throughout Perry's basement. These included (1) stains on the floor near a doorway, (2) a stain at the top of the stairway, (3) stains "making their way down the stairs to the basement," and (4) a stain on a "can of spray foam insulation." Officer Blum found this last stain significant because he noticed a substance similar to spray foam insulation on Ellison's pants at her autopsy. Additionally, Officer Blum found a pendant similar to the one Ellison wore and a "necklace chain" to which the pendant was previously attached on the basement floor. (During her testimony, Ellison's niece, Alyssa Rosanova, identified this as being the pendant Ellison wore in a photo she was shown.) Officer Blum also discovered stains on the exterior stairs leading down to the basement and a stain on the inside of the door to Perry's apartment.

¶ 35                                     l. Kelly Krajnik

¶ 36        Illinois State Police forensic scientist Kelly Krajnik tested the bloodstains discovered on the cart outside defendant's residence and the blood discovered inside both defendant's and Perry's residences. Ellison's DNA was found in the stain in the stairwell at defendant's residence and on the can of foam insulation. Defendant's and Ellison's DNA was found in the bloodstains on the cart, on a pair of shears found in the basement, and in the stains in the exterior stairway leading to the basement. Defendant's DNA was found in a stain on a steel I-beam in the basement. DNA from "at least three individuals" was found in the stain on the inside of the door to Perry's apartment. (Krajnik testified "obtaining a mixture from a common touch point like a door is not uncommon at all.")

¶ 37                                    m. Perry Sanders

¶ 38        Perry Sanders testified defendant was his cousin and came to his apartment one morning the week of January 18, 2021. After Perry let defendant inside, Perry "laid back down." When asked what defendant was doing inside, Perry first said, "Nothing." Shortly thereafter, Perry stated defendant was "pacing" in the apartment. Perry then told defendant to sit down, but defendant "just stood there." Defendant then asked Perry for some water.

¶ 39        At some point thereafter, Perry was "walking from the store and the police just rode up on [him]." The police "grabbed" Perry and told him a detective wanted to talk to him. Perry later spoke with a detective but testified he did not recall who the detective was or telling the detective (1) defendant asked him for a sheet, (2) he saw defendant with blood on him or his jacket, (3) defendant allegedly stated, "[Y]ou don't understand," and "[W]hen I left, she had a pulse," or (4) he saw defendant with a light green three-wheeled cart. Perry accompanied his cousin Tyronda to Ellison's house to check to see if "a lady that [he] didn't know" was okay.

¶ 40                              n. Additional Testimony of Sergeant Mocilan

¶ 41          Sergeant Mocilan was recalled to the stand to testify about his interaction with Perry at the Peoria police station on January 25, 2021. Perry told Sergeant Mocilan he observed defendant with blood on him, and defendant asked him for a sheet when he was at Perry's apartment. Perry told Sergeant Mocilan that defendant told him, "[Y]ou don't understand, she had a pulse when I left," though, on cross-examination, Sergeant Mocilan admitted defendant apparently did not specify who "she" was. Perry reported seeing defendant with a pushcart. The video of this conversation was played to the jury.

¶ 42                              o. Roberto Vasquez

¶ 43          Peoria police detective Roberto Vasquez and Sergeant Mocilan met with defendant on January 22, 2021. Defendant stated he "didn't want to be dishonest in any way, shape or form," he knew Ellison was missing, and he "wanted to help" the police. At this time, however, Detective Vasquez knew defendant took a cab to East Peoria and that Ellison was found dead there. After their conversation, Detective Vasquez took photographs of defendant. Defendant had a "small abrasion on his [right] pinkie" and "some sort of injury to his [left] middle finger." The video of this conversation was played to the jury.

¶ 44                              2. *Defendant's Evidence*

¶ 45          Defendant testified he and Ellison dated for approximately one year. Defendant stated Sunday, January 17, 2021, was the last time he saw Ellison alive. Defendant was at Ellison's home, though he could not recall why. Defendant returned home from East Peoria around 11 p.m. on January 19, 2021. Shortly before midnight, defendant discovered Ellison deceased in an alley approximately 40 yards from his residence. Defendant explained:

- 10 -

"I was upstairs in my bedroom, and I heard a noise outside. I thought that someone was breaking into my cousin's garage who lives next door. So I went out to investigate, and I didn't see anything or anyone in the area, but I saw something up the alley ways that was out of place. It's something that was—I couldn't identify it at that distance and at that time of night.

\* \* \*

I—initially I thought it was a homeless person or somebody drunk or under the influence of drugs of some sort. I didn't realize that the person was injured or anything. So I just called out to them a few times. When they didn't respond, I knelt down beside them and shook them a little bit, and still no response."

¶ 46 After realizing it was Ellison in the alley, defendant picked her up and carried her into his house. Defendant did not immediately call the police. When asked why, defendant explained:

"Initially, I was—initially, I checked for a pulse, a pulse and respiration. I was trying to assess and see how bad the injuries was [*sic*] to see how bad the situation was. It was just a—I guess a first instinct. I realized that she wasn't breathing. So I tried to do CPR before I did anything else."

¶ 47 At that point, defendant tried to find his phone to call 911. Defendant claimed he "ran upstairs to [his] bedroom" and "tore the bedroom apart looking for [his] phone." Defendant eventually found his phone "downstairs by the chair in the living room." While searching for his

- 11 -

phone, his housemate was shouting as to what was going on. Defendant eventually told his housemate what was going on, but his housemate also did not call the police, as he had lost his phone a few weeks before. Defendant eventually found his phone but still did not call the police. Defendant explained, "I was scared that I was going to be blamed for this." When asked what he did then, defendant stated:

> "A long period of time passed. It was almost like I was in a state of shock and it's hard to put time frames on things. So I was sitting there for a while just trying to think and figure out what to do. At that point I went back out to the alley where I had found her and looked around. I was trying to assess the items that were around her to see if they were involved in some way with the crime and that may help to prove that I didn't do this."

Defendant found "things" in the alley but did not specify what they were. Defendant did not know "if they would help to prove that [he] didn't do it or not" because he is "not a forensics expert."

¶ 48 Thereafter, defendant walked to Perry's residence in an effort to "find people who might have been awake during the wee hours of the night" and "might have seen something." Upon arriving at Perry's residence, defendant found three people, "but [he] didn't really get a chance to talk to them." One of these three people was Perry, but he refused to allow defendant inside his apartment. When defendant tried to get inside, Perry put him in a chokehold, dragged him back down two steps, and threw him down the stairs, reopening a cut to his right hand. Defendant was leaving Perry's residence when he observed what "appeared to be a blood-like substance by the basement door leading downstairs." Defendant told Perry, "[W]e need to call the police." In response, Perry "grabbed [defendant] and threatened [him] and told [him] not to

call the police over there and made [him] leave." After Perry exited the building, defendant went down into the basement "[t]o better investigate, to see." After seeing blood in the basement, defendant left, went back home, and "was trying to figure out what to do."

¶ 49 On January 20, 2021, defendant arranged to transport Ellison's body in a cab to the woods. When asked why, defendant confessed he knew this was a bad situation and he needed an attorney. Defendant was "trying to buy some time."

¶ 50 Defendant admitted he did not tell the detectives Ellison was in the woods. When asked why, defendant explained:

> "Well, because I know that moving a body is illegal. And that's—you know, I mean, I know that—I know that's a major offense. And so I don't want to get in trouble for that. And also, like I said, I was still trying to hire an attorney. I was still hoping to hire an attorney before any of this came out."

¶ 51 On cross-examination, defendant admitted he could have cried out for help upon discovering Ellison in the alley. Defendant admitted not only taking Ellison's body to the wooded area in East Peoria, but wrapping it up (while still at his residence) and covering it with leaves in an attempt to hide it. Defendant stated his plan was to then leave Illinois to meet with a family member out of state who would provide him money to hire an attorney. When asked why he could not have simply called this family member, defendant stated, "It was something and the amount of money that I needed, I felt it was better to speak to that person in person." Defendant admitted to lying to the detectives, having known exactly where Ellison was but telling them she was missing and he wanted to help them.

¶ 52                    3. *Verdict*

¶ 53         On June 7, 2023, the jury found defendant guilty of first degree murder. The jury also found the State proved the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The trial court scheduled the sentencing hearing for August 17, 2023.

¶ 54                    4. *Posttrial Proceedings*

¶ 55         On June 23, 2023, defendant filed a *pro se* docketing statement and (premature) notice of appeal with the Peoria County circuit court clerk. In the section of the docketing statement entitled "General statement of issues proposed to be raised," defendant typed, "Ineffective Assistance of Counsel."

¶ 56         On August 17, 2023, defendant's counsel made an oral motion to continue the sentencing hearing, explaining a final judgment was needed before filing an appeal and that he intended on filing a motion for a new trial. Despite defendant's refusal to appear, the State announced it was ready to proceed, as witnesses were present for the sentencing hearing. The State also conceded a motion for a new trial needed to be filed prior to any sentencing.

¶ 57         The trial court rescheduled the sentencing hearing for August 24, 2023. In the rescheduling order, the court stated, "[I]f defendant again refuse[s] to attend his sentencing hearing, [he] will waive his right to be present at post-trial motions and sentencing and both will be held in his [absence]." The Peoria County Sheriff's Office served defendant with this order the same day. The document confirming service contained a handwritten annotation at the bottom, reading, "It was explained to him as well and he understood the section regarding waive right to be present at next hearing." The following day, defendant's counsel filed a motion for a new trial.

¶ 58        Defendant refused to appear for the rescheduled sentencing hearing. The trial court denied defense counsel's motion for a new trial. After hearing a victim impact statement from one of Ellison's relatives, the court delivered its sentencing judgment:

> "The Court has considered the presentence investigation report, the evidence and arguments presented, has considered all of the statutory factors in aggravation and mitigation, the history and character of the defendant, having due regard for the circumstances and the nature of the offense I find as follows:
>
> In aggravation the conduct was exceptionally brutal and heinous as the jury found. I really—I find [defendant] a coward with no heart and no soul and he has demonstrated that at every single point in this case. He got up on the stand and did not take accountability for his actions. Well, let's back up. After it happened, he ran, coward. Then he appeared, he took the stand, and he lied. And then here we are today. He doesn't appear to face all of you. I can't find anything redeeming about [defendant], nothing.
>
> And I'm sorry to all of you that the court system can't bring [Ellison] back. The court system can't undo this tragedy and it was senseless. It was unnecessary. It was cruel and heartless. And this sort of behavior, it doesn't even seem enough to say it needs to be deterred. I mean, the Court cannot say enough about the heinous

nature of this crime and [defendant's] behavior. I have tried to find

something mitigating about [defendant]. I cannot.

He is sentenced to natural life in prison."

¶ 59    This appeal followed.

¶ 60                            II. ANALYSIS

¶ 61    On appeal, defendant argues (1) he was denied his constitutional right to the

effective assistance of counsel when trial counsel failed to object to the admission of Perry's

prior inconsistent statement incriminating defendant in Ellison's murder; (2) his *pro se* posttrial

claim, in a docketing statement accompanying a premature notice of appeal, of receiving

ineffective assistance of counsel required the trial court to either conduct a *Krankel* inquiry or

obtain his waiver of said inquiry; and (3) the court denied him a fair sentencing hearing by

imposing a natural life sentence in part due to his exercising his right to be absent for the

hearing.

¶ 62    A. Trial Counsel Was Not Ineffective for Failing to Object to the Admission of

Perry's Prior Inconsistent Statement

¶ 63    First, defendant argues he was denied his constitutional right to the effective

assistance of counsel when trial counsel failed to object to the admission of Perry's prior

inconsistent statement incriminating defendant in Ellison's murder. Specifically, defendant

contends Perry's statement during his interview with Sergeant Mocilan that defendant told Perry,

"[Y]ou don't understand, she had a pulse when I left," is inconsistent with his testimony

disclaiming any recollection of making such a remark to Sergeant Mocilan. Defendant argues

this statement was not admissible either as substantive or impeachment evidence.

¶ 64 Criminal defendants have the right to the effective assistance of counsel under both the United States and Illinois constitutions. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance of counsel are analyzed under the framework set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36. "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). "Because a defendant must establish both a deficiency in counsel's performance and prejudice resulting from the alleged deficiency, failure to establish either proposition will be fatal to the claim." *People v. Sanchez*, 169 Ill. 2d 472, 487 (1996). A court may decide a claim of ineffective assistance of counsel by proceeding to the prejudice prong without addressing counsel's performance. *People v. Hale*, 2013 IL 113140, ¶ 17. We review claims of ineffective assistance of counsel *de novo*. *Id.* ¶ 15.

¶ 65 As our supreme court has explained:

"It is a well settled general rule that what a witness states out of court and out of the presence of the defendant is pure hearsay and is incompetent as substantive evidence. [Citation.] However, section 115-10.1 of the Code [of Criminal Procedure of 1963 (Code)] allows a party to use a witness's prior inconsistent

statement as substantive evidence under certain circumstances."

*People v. Simpson*, 2015 IL 116512, ¶ 27.

¶ 66 Section 115-10.1 of the Code provides, in pertinent part:

"In all criminal cases, evidence of a statement made by a witness is

not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the

hearing or trial, and

(b) the witness is subject to cross-examination concerning

the statement, and

(c) the statement—

\*\*\*

(2) narrates, describes, or explains an event or condition of

which the witness had personal knowledge, and

\* \* \*

(C) the statement is proved to have been accurately

recorded by a tape recorder, videotape recording, or any other

similar electronic means of sound recording." 725 ILCS 5/115-

10.1 (West 2022).

¶ 67 The "personal knowledge" component of section 115-10.1 "means the witness

must have actually perceived the events that are the subject of the statement." *People v.*

*Thornton*, 2024 IL App (4th) 220798, ¶ 61. More specifically, "the witness must have observed

the events being spoken of, rather than simply hearing about them afterwards." *People v.*

*McCarter*, 385 Ill. App. 3d 919, 930 (2008). "One of the policies underlying section 115-10.1 of

the Code is to protect parties from 'turncoat' witnesses who back away from a former statement made under circumstances indicating that it was likely to be true." *People v. Speed*, 315 Ill. App. 3d 511, 517 (2000).

¶ 68        Here, the State concedes defendant's statement to Perry, "[Y]ou don't understand, she had a pulse when I left," which Perry conveyed to Sergeant Mocilan during his interview, was inadmissible as substantive evidence due to Perry's lack of personal knowledge of defendant's final interaction with Ellison. However, "even if a statement is not admissible for the truth of the matter asserted under section 115-10.1, that does not automatically preclude it from being used for impeachment purposes." *McCarter*, 385 Ill. App. 3d at 932. After setting forth the criteria for the admission of a prior inconsistent statement as substantive evidence, section 115-10.1 provides, "Nothing in this Section shall render a prior inconsistent statement inadmissible for purposes of impeachment because such statement was not recorded or otherwise fails to meet the criteria set forth herein." 725 ILCS 5/115-10.1 (West 2022). It is not enough that a prior statement is inconsistent with trial testimony for it to be admissible for impeachment purposes. Instead,

> "[a] party may only impeach its own witness through use of a prior inconsistent statement when the testimony of that witness does 'affirmative damage' to the party's case. [Citations.] For witness testimony to be affirmatively damaging, it must do more than fail to support the State's position; it must give 'positive aid' to the defendant's case, for instance, by being inconsistent with the defendant's guilt under the State's theory of the case. [Citations.] It

is insufficient that a witness merely disappoints the State by failing to incriminate the defendant. [Citation.]

This limitation on the use of prior inconsistent statements is necessary because the purpose of impeachment is to cancel out damaging testimony by a witness; if no such damaging testimony has been proffered, then the only purpose of introducing a prior inconsistent statement is to get it before the jury as substantive evidence." *McCarter*, 385 Ill. App. 3d at 933.

¶ 69 Here, Perry's testimony did not affirmatively damage the State's case. Perry's testimony established (1) defendant was familiar with, and had access to, Perry's apartment (where the State argued Ellison's murder took place) and exhibited behavior in the apartment consistent with a nervous, guilty state of mind, such as pacing the apartment and asking for water, and (2) Perry accompanied Tyronda to "check to see" if "a lady [he] didn't know" was alright—this coming after Tyronda's testimony that she and Perry went to Ellison's residence after Tyronda received a phone call about Ellison. Perry's earlier recitation to Sergeant Mocilan of the highly incriminating statement from defendant about Ellison having a pulse when defendant last saw her is inconsistent with his testimony that he did not recall making such a statement. "Where a witness claims that he cannot recall a matter at trial, a former affirmation of it should be admitted as a contradiction." *People v. Leonard*, 391 Ill. App. 3d 926, 933 (2009). But this *particular* piece of testimony did *not* assist defendant's case.

¶ 70 In *Leonard*, the Third District noted that "[w]hen a witness professes a lack of memory regarding a prior statement, his testimony may be considered damaging." *Id.* In support of this proposition, the *Leonard* court cited this court's decision in *Speed*. *Id.*; see *Speed*, 315 Ill.

App. 3d at 517 ("It is just as damaging to a party when such a witness professes a lack of memory of the event or of making the statement.").

¶ 71          However, in *People v. Wilson*, 2012 IL App (1st) 101038, the First District addressed whether this proposition meant that a witness's testimony must be "affirmatively damaging" to its side's case by giving "positive aid" to the other side's case for a prior inconsistent statement to be admissible for impeachment purposes. The *Wilson* court acknowledged the above-mentioned statement from *Leonard* and the *Leonard* court's citation to *Speed*. However, the *Wilson* court noted how Speed "only addressed the 'inconsistency' requirement in connection with the substantive admission of prior statements, *not* the affirmative damage requirement for impeaching one's own witness." (Emphasis added.) *Id.* ¶ 45. The court continued:

> "We also find [this] statement from *Leonard* contrary to our
> supreme court's instruction that ' "[d]amage" *** does not occur
> where a party interrogates a witness about a fact which would be
> favorable to the examiner if true, but then receives a reply which is
> merely negative in its effect on the examiner's case.' [*People v.*
> *Cruz*, 162 Ill. 2d 314, 360 (1994)]; see also Michael H. Graham,
> Graham's Handbook of Illinois Evidence § 607.4 (10th ed. 2010)
> ('To the extent that *People v. Leonard* *** asserts that a professed
> lack of recollection is to be considered affirmatively damaging
> with respect to impeachment of a witness called by that party by
> means of a prior inconsistent statement not substantively

admissible, *Leonard* is completely wrong and must not be

followed.').'" *Id.*

We agree with the First District's qualification of the above-quoted passage from our decision in *Speed* and agree that "a witness's professed lack of memory, standing alone, does not 'affirmatively damage' a party's case for the purpose of impeaching one's own witness." *Id.* Thus, the prior inconsistent statement at issue was not admissible either as substantive or impeachment evidence.

¶ 72        Trial counsel was arguably deficient in failing to object to the admission of Perry's prior inconsistent statement incriminating defendant in Ellison's murder. See *Simpson*, 2015 IL 116512, ¶ 36 (concluding the "defendant [showed] that his counsel's representation fell below an objective standard of reasonableness" where there was "no strategic reason for defense counsel's failure to object to [a witness's] videotaped statement to police" because "[the witness] basically told police that [the] defendant confessed to beating the victim to death"). As mentioned, however, both prongs of the *Strickland* standard must be met for a successful claim of ineffective assistance of counsel. See *Sanchez*, 169 Ill. 2d at 487 (1996). Even assuming, *arguendo*, counsel's deficiency in this respect, we must consider whether "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694).

¶ 73        Here, there is no such reasonable probability. The evidence adduced points to only one rational conclusion. Defendant murdered Ellison, his girlfriend, in Perry's (his cousin's) basement, took her body back to his own residence in a pushcart, wrapped her in a sheet, and used a cab to transport her body to a wooded area some distance from both his residence and the scene of the murder. No other rational explanation exists for:

(1) Ellison's sudden and otherwise inexplicable disappearance from her neighborhood, prompting several acquaintances to go to her residence in an unsuccessful attempt to find her;

(2) her surreptitious and worrisome behavior in her home while interacting with her friend just days before her murder;

(3) defendant's pushcart's appearance of containing blankets while he rolled it down the street near his residence and his alibi that he was going to do laundry;

(4) the pushcart's otherwise inexplicable heaviness as Watts observed defendant, approximately 30 minutes after he was first seen rolling it down the street (supposedly to do laundry), struggling over several minutes to carry it from his doorstep to the cab;

(5) defendant's hostile refusal to allow Watts to help him get "his bags" in and out of the cab;

(6) the subsequent discovery of the pushcart in front of defendant's residence bearing bloodstains determined to contain both his and Ellison's DNA;

(7) the discovery of Ellison's body in the same wooded area to which Watts took defendant, wrapped up and partially concealed by leaves;

(8) the discovery of defendant's bloody clothing in this same area;

(9) the presence of defendant's and Ellison's DNA in a multitude of bloodstains in both his and Perry's residences;

(10) the presence of Ellison's necklace on the floor of Perry's basement amid these bloodstains;

(11) the presence of both defendant's and Ellison's DNA in bloodstains on a spray can in Perry's basement;

(12) the presence of this can's contents in the wooded area and on Ellison's pants at her autopsy;

(13) defendant's erratic behavior at Perry's residence, with blood on his body, as described in Perry's admissible statements from his police interview, illustrative of a consciousness of guilt;

(14) the injuries discovered on defendant's hands after his police interview;

(15) the forensic determination Ellison suffered a devastating torrent of punches, blunt force injuries, and stab wounds over every area of her body and died by strangulation; and

(16) defendant's admissions on the stand to having (a) taken Ellison's lifeless body into his residence, (b) wrapped her up, (c) deposited her body in the woods, and (d) lied to police when he said he knew she was missing and wanted to help them.

All of this evidence was disconnected from the lone prior inconsistent statement from Perry's police interview.

¶ 74        In the face of overwhelming evidence of his guilt, defendant offered a version of events which could *at best* be described as implausible in the extreme. According to defendant, he last saw Ellison alive the Sunday before her death, when he was at her home for a reason he could not recall. While at his home two nights later, shortly before midnight, defendant "heard a noise outside" and happened to see a person lying immobile and unresponsive in the alley. Defendant then discovered this person was Ellison, his girlfriend of approximately one year. Defendant then attempted CPR, rather than immediately calling the police. Defendant then "tore the bedroom apart" looking for his phone and *still* did not call the police after finding it. Rather than immediately calling for help upon the harrowing discovery of his girlfriend dead in the alley near his residence, defendant became concerned over being blamed for what happened and, therefore, went back to the alley to "try[ ] to assess the items that were around her to see if they were involved in some way with the crime and that may help to prove that [he] didn't do this." Defendant found unspecified "things" in the alley but professed not to know their usefulness for proving his innocence, as he was "not a forensics expert." After deciding to try to find people in the area who may have been awake and witnessed the incident, defendant walked directly to Perry's residence, as he was supposedly unable to talk to the other two people he found en route. When defendant attempted to get into Perry's apartment, Perry put him in a chokehold and threw him down the stairs, reopening a cut to his right hand. Moments later, defendant just so happened to notice what "appeared to be a blood-like substance by the basement door leading downstairs" and *then* decided it was time to call the police. Yet defendant *still* did not make the call. Instead, defendant, with his freshly cut right hand, went to the basement to "investigate." Of course,

defendant *wanted* to call the police, but he needed the help of an attorney to do so because of how concerned he was about the "major offense" of *moving* Ellison's body (to say nothing of wrapping it up, depositing it in the woods, and covering it with leaves to hide it). Hence defendant's plan was to meet with a relative out of state to borrow money to hire an attorney, as the sheer amount of money involved required him to meet this relative in person. When he eventually spoke to the police, defendant told them how much he wanted to help them, but he subsequently admitted he lied by telling them Ellison was missing.

¶ 75    In the context of ineffective assistance of counsel, our supreme court has sanctioned "consider[ing] the claims in light of the strength of the evidence against the defendant and the possible prejudicial effect of the alleged defective representation." *People v. Enoch*, 122 Ill. 2d 176, 202 (1988). Exclusive of the inadmissible prior inconsistent statement at issue, the evidence of defendant's guilt was positively overwhelming. There is no reasonable probability the outcome would have been different had trial counsel successfully objected to the admission of this statement. This court concludes defendant's trial counsel was not ineffective.

¶ 76    B. The Trial Court Was Not Required to Conduct a *Krankel* Inquiry

¶ 77    Following his trial but before his sentencing, defendant filed a *pro se* docketing statement and a notice of appeal with the Peoria County Circuit Clerk. In the section of the docketing statement entitled "General statement of issues proposed to be raised," defendant typed, "Ineffective Assistance of Counsel." The trial court never conducted an inquiry into defendant's *pro se* posttrial claim of ineffective assistance of counsel or obtained his waiver of his right to said inquiry. Defendant requests this court remand for the narrow purpose of determining if the appointment of new counsel is warranted.

¶ 78 The duty of a trial court to conduct an inquiry into a defendant's *pro se* posttrial claim of ineffective assistance of counsel was set forth in *Krankel*. Our supreme court has explained the appointment of new counsel is not automatic when there is a *pro se* motion alleging ineffective assistance of counsel. Instead, the court should examine the factual basis, and if the claim lacks merit or pertains to trial strategy, then new counsel need not be appointed and the motion should be denied. If there is possible neglect, new counsel should be appointed. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003).

¶ 79 Our supreme court has explained the relatively low threshold for triggering a trial court's obligation to investigate this type of posttrial claim:

> "When a criminal defendant believes that he has not received effective assistance of counsel at his trial and he so notifies the court, the court must inquire into his claim. [Citation.] A *pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention. [Citation.] The defendant may do so by way of a written motion but need not do so in such a formal manner. [Citation.] He may also make an oral motion [citation] or give the court a letter or note [citation]. This court has even held that a *pro se* defendant need not provide the underlying factual basis for his claim so long as he alleges that he has received 'ineffective assistance of counsel.' [Citation.] To raise a claim of ineffective assistance of counsel, however, the defendant must clearly raise that claim with the court. [Citation.]" (Internal quotation marks omitted.) *People v. Bates*, 2019 IL 124143, ¶ 15.

An appellate court reviews a trial court's alleged failure to conduct a *Krankel* inquiry *de novo*. *Id.* ¶ 14.

¶ 80 The fact defendant raised his claim of ineffective assistance of counsel in a docketing statement and not a formal motion would not obviate the trial court's need to hold a *Krankel* hearing. *Id.* ¶ 15. Nor would the bare use of the term "ineffective assistance of counsel." *Id.* But this court must consider whether defendant met his burden of bringing this claim to the trial court's attention. *Id.*

¶ 81 Defendant filed his *pro se* docketing statement on June 23, 2023. The next entry in the common law record of this case is the filing of defendant's presentence investigation report on August 11, 2023. The next hearing took place on August 17, 2023, which was initially scheduled as the sentencing hearing. In the course of requesting a continuance, defendant's counsel indicated he intended to file an appeal but understood there must be a final judgment entered from which he could appeal. Before that was to occur, he intended to file a motion for a new trial. If the motion was granted, there would be no sentencing hearing and thus no final judgment from which he would appeal. If the motion was denied, defendant would then be sentenced, a final judgment would be entered, and *then* counsel could initiate the appeal. But the disposition of the motion for a new trial was the first step in the process towards a potential appeal. There is nothing in counsel's or anyone else's remarks at the August 17, 2023, hearing or at the rescheduled sentencing hearing on August 24, 2023, for which defendant also refused to appear, to suggest his counsel, the State, or the trial court were even aware of his *pro se* docketing statement reflecting a claim of ineffective assistance of counsel (or his premature *pro se* notice of appeal). See *People v. Lewis*, 165 Ill. App. 3d 97, 109 (1988) (finding the defendant waived the issue of ineffective assistance of counsel in that, "[o]ther than in his letter

to the [trial] court, [the] defendant did not, at any time, claim the incompetence of his trial attorneys," and "[i]t would also appear, from the record, that the trial judge, [the] defendant's counsel, and the State were all unaware of [the] defendant's letter as no mention was made of it, and [the] defendant did not himself refer to it in the post-trial proceedings"). As neither counsel nor the court was aware of defendant's claim of ineffective assistance of counsel, we cannot criticize the court for failing to take any action. Accordingly, defendant waived his ineffective assistance of counsel claim, and the court was not required to conduct a *Krankel* inquiry.

¶ 82                 C. Defendant Was Not Denied a Fair Sentencing Hearing

¶ 83         Finally, defendant argues the trial court denied him a fair sentencing hearing by imposing a natural life sentence in part due to his exercising his right to be absent for the hearing.

¶ 84         As a preliminary matter, defendant acknowledges he did not preserve this issue in the trial court for this court's review. "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). However, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Under the plain error doctrine,

> "a defendant must first show that a clear or obvious error occurred. [Citation.] In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. [Citation.] Under both prongs of the plain-error doctrine, the defendant has the burden of

persuasion. [Citations.] If the defendant fails to meet his burden,

the procedural default will be honored." *Hillier*, 237 Ill. 2d at 545.

"The initial step in conducting plain-error analysis is to determine whether error occurred at all."

*People v. Walker*, 232 Ill. 2d 113, 124 (2009).

¶ 85          The Illinois Constitution requires that sentences be determined according to the

seriousness of the offense and with the objective of restoring the offender to useful citizenship.

Ill. Const. 1970, art. I, § 11. In determining an appropriate sentence, the trial court must carefully

balance the factors in aggravation and mitigation. *People v. Quintana*, 332 Ill. App. 3d 96, 109

(2002). The court is not required to specifically outline the exact process by which it determined

the sentence, nor is it required to make an express finding the defendant lacked rehabilitative

potential. *People v. Redmond*, 265 Ill. App. 3d 292, 307 (1994). "The seriousness of the crime is

the most important factor in determining an appropriate sentence, not the presence of mitigating

factors such as the lack of a prior record, and the statute does not mandate that the absence of

aggravating factors requires the minimum sentence be imposed." *Quintana*, 332 Ill. App. 3d at

109.

¶ 86          A trial court must confine its consideration of sentence to the proper factors.

"Consideration of an improper factor in aggravation clearly affects the defendant's fundamental

right to liberty, and a court of review must remand such a cause for resentencing, except in

circumstances where the factor is an insignificant element of the defendant's sentence." *People v.*

*Reed*, 376 Ill. App. 3d 121, 128 (2007). In reviewing a claim that a trial court relied on an improper

factor in fashioning its sentence, the defendant must show more than the mere mentioning of an

improper fact. The defendant must show the trial court relied on the improper fact when imposing

the sentence. *Id.* Whether the trial court relied on an improper aggravating factor in sentencing a

defendant is a question of law reviewed *de novo*. *People v. Matute*, 2020 IL App (2d) 170786, ¶ 53.

¶ 87    At defendant's sentencing hearing, before imposing its sentence of natural life imprisonment, the trial court stated, in pertinent part:

> "In aggravation the conduct was exceptionally brutal and heinous as the jury found. I really—I find [defendant] a coward with no heart and no soul and he has demonstrated that at every single point in this case. He got up on the stand and did not take accountability for his actions. Well, let's back up. After it happened, he ran, coward. Then he appeared, he took the stand, and he lied. And then here we are today. He doesn't appear to face all of you. I can't find anything redeeming about [defendant], nothing."

¶ 88    This court concludes that far from "relying on" defendant's absence from the hearing in imposing a natural life sentence, the trial court merely observed his absence in a passing remark in the context of the whole hearing. This is significantly different from an instance where a trial judge explicitly states their sentencing decision is based, at least in part, on the defendant's decision to exercise one of his rights, particularly one of a constitutional dimension. See *id.* ¶¶ 56-57, 63 (When the trial judge stated, "I find [it] a little bit disturbing that the defendant has not offered any allocution whatsoever," and "I also considered heavily the defendant's lack of remorse," the judge "relied at least in part on an improper sentencing factor," namely his fifth amendment (U.S. Const., amend. V) right against self-incrimination, which "impinged upon [the defendant's] fundamental right to liberty," and thus "he has established

plain error under the second prong."); see also *People v. Maggio*, 2017 IL App (4th) 150287, ¶¶ 49-50 (When the trial court found the defendant's refusal to participate in the presentence investigation was "significant *** and troubling" and was "a telling indication of defendant's attitude," it improperly commented on his fifth amendment right to remain silent during the investigation and said comment "weighed heavily in the court's sentencing decision."). However, to the extent the court's comment could be construed as "relying" *at all* on defendant's absence from the sentencing hearing for its imposition of a natural life sentence, the significance it attached to this, as reflected in its other comments, was dwarfed by the significance it attached to the extremely violent nature of Ellison's death at defendant's hands—hands which bludgeoned and stabbed her, covering virtually every inch of her body with injuries while she was still alive, before strangling her to death and discarding her in the woods. Under either interpretation, the court did not err in making this reference to defendant's absence at his sentencing hearing. "Where there is no error, there can be no plain error." *People v. Bair*, 379 Ill. App. 3d 51, 60 (2008). Defendant was not deprived of a fair sentencing hearing.

¶ 89                                III. CONCLUSION

¶ 90          For the reasons stated, we affirm the trial court's judgment.

¶ 91          Affirmed.

- 32 -